# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LAUREL HILBERT, on behalf of himself and all others similarly situated, 4031 Massachusetts Avenue, N.W. Unit 7002 Washington, D.C. 20009 | ) ) ) ) ) ) | **Case No.** |
| *Plaintiff*, | ) ) | |
| v. | ) ) | **Class Action Complaint** |
| CHARLES SCHWAB & CO., INC. SERVE: C T CORPORATION SYSTEM 1015 15th St, NW, Suite 1000 Washington, District of Columbia 20005 | ) ) ) ) ) ) | **Jury Trial Demand** |
| *Defendant.* | ) ) ) | |

## <u>VERIFIED COMPLAINT</u>

### <u>INTRODUCTION</u>

1.  Plaintiff, Mr. Laurel Hilbert, on behalf of himself and others similarly situated, asserts the following claims against Defendant, Charles Schwab & Co., Inc., doing business as the Charles Schwab ("Defendant" or "Schwab") as follows:

2.  The Supreme Court of the United States has stated "[t]he Internet's prevalence and power have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of Americans had Internet access whereas by 2018 the number increased to roughly eighty-

nine (89) percent). This number has steadily increased as polling data from 2021 shows ninety-three (93) percent of American adults use the Internet.[1]

3.   Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2] According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 16,400 visually impaired persons lived in the District of Columbia.[3]

4.   Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update and operate its website, "Thinkorswim" platform and/or mobile application platforms (hereinafter collectively "Website") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.   Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.   For this significant portion of Americans, accessing websites, mobile applications, and other information has become a necessity, not a convenience.

---

[1]      Internet/Broadband Fact Sheet, PEW RESEARCH CENTER (April 7, 2021) https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited April 3, 2024). Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

[2]      Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited June 10, 2025). The report uses data from the 2018 American Community Survey.

[3]      Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited June 10, 2025).

7.      The U.S. Chamber of Commerce has documented consumers' increasing reliance on the

internet to shop online:

> The average consumer spends more than $1,700 per year on online
> shopping, a number that's continuing to rise. The convenience,
> affordability and ability to compare prices with ease has led more and more
> customers to visit e-commerce sites before heading to a brick-and-mortar
> location.[4]
> New research by Leanplum found that 95% of consumers will buy at least
> half of their gifts online. Shoppers, especially millennials and Gen Zers,
> favor the convenience and the great offers and discounts associated more
> with shopping online than visiting a brick-and-mortar location. It's these
> groups that are driving e-commerce retailers to be strategic with their
> website design. The Leanplum survey found that 80% of respondents shop
> on their mobile devices.[5]

8.      Even the Supreme Court has acknowledged the phrase, "'There's an app for that' has

become part of the 21st-century American lexicon." *Apple Inc. v. Pepper*, 139 S. Ct. 1514,

1518, 203 L.Ed.2d 802, 806 (2019).

9.      But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors

that can facilitate or impede technology adoption and use by people with disabilities."[6]

10.     This is especially true with respect to accessing goods and services over the internet,

---

[4]     Emily Heaslip, *A Guide to Building an Online Store*, U.S. Chamber of Commerce (Sept. 20, 2019), https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last accessed March 9, 2024).

[5]     Emily Heaslip, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping*, U.S. Chamber of Commerce (Jan. 6, 2020), https://www.uschamber.com/co/run/technology/building-mobile- friendly-ecommerce-websites (last accessed March 9, 2025). "According to one report, e- commerce is growing 23% each year[.]" Emily Heaslip, *The Complete Guide to Selling Online*, U.S. Chamber of Commerce (Jan. 28, 2020), https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last accessed March 9, 2025).

[6]     *National Disability Policy: A Progress Report*, Nat'l Council on Disability (Oct. 7, 2016), https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed June 13, 2025); *see also* Progress Report 2023: Towards Economic Security: The Impact of Income and Asset Limits on People with Disabilities (2023), https://www.ncd.gov/report/2023-progress-report-toward-economic-security-the-impact-of-income-and-asset-limits-on-people-with-disabilities/ (accessed March 9, 2025).

where people with disabilities stand to benefit immensely if online services were fully

and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than
> their nondisabled peers because of inherent transportation, communication,
> and other barriers. A blind person does not have the same autonomy to drive
> to a covered entity's office as a sighted person. A deaf or hard of hearing
> person does not have the same opportunity to call a covered entity's office.
> A person with an intellectual disability does not have the same ability to
> interact independently with the staff at a covered entity's office. The 24-
> hour-a-day availability of information and transactions on covered entity
> websites and mobile apps provides a level of independence and convenience
> that cannot be replicated through any other means. That is why the number
> of Americans who rely on the Internet has increased year after year and why
> entities offer information and transactions through that unique medium.[7]

11.     When digital content is properly formatted, it is universally accessible to everyone.  When

it is not, the content provider fails to communicate to individuals with a visual disability

effectively. In turn, these individuals must expend additional time and effort to overcome

communication barriers not applicable to sighted users, which may require the assistance

of third parties or, in some instances, may deny outright access to the online service.[8]

12.     Unfortunately, Mr. Hilbert cannot fully and equally access Defendant's Website and

mobile app because Defendant's accessibility policies and practices have made it

impossible to fully and equally perceive, understand, or operate the Website's content with

---

[7]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of
Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web
Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119
-AA65, Answer 57 (October 7, 2016) (citations omitted).

[8]     These factors often lead disabled individuals to abandon the process of purchasing items
online after they begin.  Kasey Wehrum, *Your Website is Scaring Customers Away. 5 Easy Ways
to Fix It.*, Inc. Mag. (Jan. 2014), https://www.inc.com/magazine/201312/kasey-wehrum/how-to-
get- online-customers-to-complete-purchase.html (last accessed June 13, 2025) (documenting the
most common causes of shopping cart abandonment, including: "Your Checkout button is hard to
find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout
process takes multiple clicks.").

screen reader auxiliary aids.

13.   As a result, this action for injunctive relief seeks an order requiring that Defendant (a) make its Website accessible to Mr. Hilbert, and (b) adopt sufficient policies and practices, the details of which are more fully described below, to ensure the Website does not become inaccessible again in the future.

14.   Defendant's denial of full and equal access to its Website and therefore denial of its goods and services offered thereby is a violation of Plaintiff's rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401, *et seq.*

15.   Because Defendant's Website is not equally accessible to blind and visually impaired consumers, they violate the ADA and the DCHRA.  Plaintiff seeks a permanent injunction, actual and liquidated damages, and reasonable attorneys' fees and costs to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's Website and mobile app will become and remain accessible to blind and visually impaired consumers.

## JURISDICTION AND VENUE

16.   This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

17.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et seq.*

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant
conducts and continues to conduct a substantial and significant amount of business in this
District via the internet regarding the subject Website addressed by this action.

19.     Defendant is subject to personal jurisdiction in this District.  Defendant has been and is
committing the acts or omissions alleged herein in this District that caused some of the
injury and violated the rights of Plaintiff and to other blind and visually impaired customers
in this District under the ADA and the DCHRA. Defendant operates physical office
locations in the District of Columbia. A substantial part of the acts and omissions giving
rise to Plaintiff's claims occurred in this District.

20.     In particular, Plaintiff has been denied the full use and enjoyment of the facilities, goods,
and services offered to the general public through its Website. Plaintiff lost all
opportunities to complete a consumer business transaction being offered by Defendant due
to the discriminatory roadblocks faced as a result of Defendant's failure to provide online
goods and services that he could effectively utilize as a visually impaired person.

21.     Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's
full and equal access multiple times in the past, and now deters Plaintiff on a regular basis
from accessing the Defendant's Website in the future without the aid of a sighted person
to help him navigate, which is antithetical to the freedoms promised to the visually
impaired by the passage of federal and state disability civil rights legislation.

22.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and
2202.

## PARTIES

23.     Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401, *et seq.*

24.     Plaintiff Laurel Hilbert resides in Washington, D.C.  He has attempted to access Defendant's Website to complete transactions on multiple occasions from 2024 through as recently as June 5, 2025, thinking that Defendant would have fixed the inaccessible features of its Website by this time.  Regrettably, he continues to be unsuccessful in completing any transaction due to the inaccessibility of the Website.

25.     Not only was Mr. Hilbert injured in fact on or about May 2024, but also, his future attempts to avail himself of Defendant's goods and services will cause him to be injured again if the inaccessibility of Defendant's Website is not remediated in conformity with the disability discrimination law requirements.

26.     As someone who is blind and actively engaged in trading and long-term financial planning, Mr. Hilbert relies on platforms that combine technical sophistication, powerful tools, and integrated account management. Among the available trading platforms in the U.S. market, Charles Schwab stands out as uniquely valuable for advanced traders. That value has only increased since Schwab acquired TD Ameritrade and integrated the "Thinkorswim" platform into its trading ecosystem.

27.     Thinkorswim is widely regarded as one of the most advanced and customizable trading platforms available to retail investors. It provides in-depth charting, strategy testing, real-

time data, options analytics, and the ability to create custom indicators through its proprietary scripting language, ThinkScript.

28.    Mr. Hilbert was drawn to this platform specifically because of its reputation for giving traders the depth and flexibility typically found only in institutional-level tools. Schwab's integration of Thinkorswim—across desktop, mobile, and web—means that an advanced trader like Mr. Hilbert can act on market movements quickly, analyze complex strategies, and manage risk effectively without having to rely on multiple providers or third-party software.

29.    Beyond advanced trading capabilities, Schwab also offers an ecosystem that supports holistic financial planning. Mr. Hilbert is not just a trader; he also cares deeply about long-term investing. Schwab enables seamless movement between active trading accounts and retirement or managed investment accounts, making it easier to manage both short- and long-term financial goals in one place. For someone like Mr. Hilbert, who takes both aspects seriously, this integration matters. Few competitors offer such a breadth of services with comparable tools and research.

30.    Moreover, Schwab's low-cost structure—offering \$0 commission trades on stocks and ETFs, competitive fees for options contracts, and high-speed execution—means that Mr. Hilbert can trade frequently without incurring prohibitive costs. He has reviewed competitors like Robinhood, Fidelity, and E\*TRADE, and while each has its strengths, none offer the combination of power, cost-efficiency, and integration that Schwab does.

31.    However, despite Schwab's strong offerings, its Website remains inaccessible to blind users like Mr. Hilbert.  He relies on screen reading software to navigate digital platforms. His repeated attempts to access Schwab's Website and app have been consistently met with

barriers: unlabeled buttons, missing alt-text, dynamic charts and tables without proper tagging, and critical functions like order entry, watchlist creation, or account navigation that are completely unusable without sighted assistance. As a result, he has been unable to manage his portfolio independently or take advantage of trading opportunities—despite Schwab being the most appropriate platform for his needs.

32.     If Schwab's Website and platform were made accessible, Mr. Hilbert would return to it as his primary platform for both trading and long-term investment. Its combination of advanced tools, cost-efficiency, and integration with broader financial services aligns closely with his financial goals and level of experience. While he continues to explore alternatives in light of Schwab's inaccessible features, Schwab remains uniquely positioned to meet Mr. Hilbert's needs—if, and only if, he can access and navigate its Website on equal footing with sighted users.

33.     Defendant Charles Schwab & Co., Inc. ("Defendant") is and was at all relevant times a corporation incorporated in California with its principal address in Texas and does business in the District of Columbia through its internet-based online Website and its physical locations.

34.     Defendant owns and administers its website https://www.schwab.com/client-home and its mobile application https://apps.apple.com/us/app/thinkorswim-trade-invest/id299366785, and it offers its goods and services to the general public through its website (collectively "Website"), which is a public accommodation within the definition of the ADA, 42 U.S.C. § 12181(7), and the District of Columbia Human Rights Act, D.C. Code § 2-1401, *et seq*.

## **NATURE OF ACTION**

35.  The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind, and visually impaired persons alike.

36.  In today's tech-savvy world, blind and visually impaired people have the ability to access websites and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display.  This technology is known as screen-reading software.  Screen-reading software is currently the only method through which a blind or visually impaired person may independently access the internet.  Unless websites and/or mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are unable to fully access websites and the information, products, and goods contained thereon.

37.  Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them.  Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately.  Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular screen-reading software programs available for a Windows computer.  "VoiceOver" is a popular program for Apple devices.

38.  For screen-reading software to function, the information on a website must be capable of being rendered into text.  If the website content is not capable of being rendered into text,

the blind or visually impaired user is unable to access the same content available to sighted users.

39.  For VoiceOver users such as Mr. Hilbert, the software relies on a Website's features and proper coding, including but not limited to "ARIA" ("accessible rich internet applications") in the Web Content Accessibility Guidelines ("WCAG"). ARIA provides what is presented visually for a visually impaired person.

40.  The international website standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content Accessibility Guidelines ("WCAG 2.1"). WCAG 2.1 are well-established guidelines for making websites accessible to blind and visually impaired people. These guidelines are universally followed by most large business entities and government agencies to ensure their websites are accessible.

## STATEMENT OF FACTS

41.  Defendant Charles Schwab & Co., Inc. ("Defendant") is a corporation that owns and operates its Website, offering features that should allow all consumers to access the goods and services provided via the internet throughout the United States, including the District of Columbia. Defendant's Website offers its products and services to the public. The Website offers features which ought to allow and avail consumers of the ability to peruse numerous functions to complete a sought-after business transaction, as in Mr. Hilbert's case.

42.  Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software. Plaintiff is, however, a proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the

internet, online programs within websites and/or mobile applications.  Plaintiff has visited and attempted to access Defendant's Website using a screen-reader on numerous occasions.

43.    Plaintiff visited and attempted to access Defendant's Website using screen-reading software to access services with Charles Schwab in Washington, D.C. from July 2023 to August 2023, in Metro Detroit, MI in August 2023, in Washington, D.C., from August 2023 to October 2023, and from New York, NY in October 2023 and in Washington, D.C. from May 2024 to the present (thinking that the Website would be remediated by now). Regrettably, he has been unable to do so due to inaccessibility issues.

44.    Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the Website's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

45.    Mr. Hilbert owns and uses a MacBook and uses Safari as his main internet browser.  Safari and MacBook harnesses Apple's "Voice-Over Software" which enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy websites by reading aloud functions on a website.

46.    Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a website using its headings, links, buttons, tables, etc. Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a website offers.  For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a website by using its headings.  He will press "H" on his keyboard once "Quick Navigation" is enabled.

47.    When websites fail to incorporate the proper and descriptive coding to mark what kinds of functions are on their website, not only does this prevent the "Quick Navigation" functionality to locate the functions on the website, but also the read-aloud functions that lack description confuse software users like Mr. Hilbert, who cannot rely on any visuals to navigate through and access a website.

**Inaccessibility of Website**

48.    In particular, when on the "Thinkorswim" app by Charles Schwab, Mr. Hilbert started to navigate by swiping right to navigate to the next item and left to navigate to the previous item. The first button on the app's homepage was labeled as a "button," providing no context for its purpose.

49.    Mr. Hilbert swiped right to the next item on the screen, and an element labeled as "default" provided no context as to its clickability. Continuing to navigate forward, the following button was labeled as "layout detail button menu." When Mr. Hilbert double-tapped it, it appeared to have opened a menu with four options that read "grid," "compact," "detail," and "heatmap."

50.    None of the previous options were labeled as a button indicating they could be selected. When Mr. Hilbert attempted to select each of the previous options, there was no indication as to what layout or how the layout changed on the screen. Continuing his navigation forward, the following was a button labeled as "edit button compose."

51.    Mr. Hilbert was confused as to its purpose; when Mr. Hilbert double-tapped it, the app seemed to have opened a pop-up with the heading that reads "edit watchlist." The way the button was labeled was not clear as to its purpose. Mr. Hilbert had to click it to find out the button was for editing the watchlist.

52.    Continuing with his navigation forward, what followed was a button labeled as "button" with no clear indication as to its purpose. Continuing his navigation forward, the following was an element labeled as "delayed quotes," followed by an element labeled as "symbol," not indicating whether or not the element is clickable.

53.    What followed was another element that reads "last"; once again, there is no clarity as to what it was for from the way it was labeled. The following element was labeled as "net chng," the auditory feedback from his screen reading software was not reading it properly due to the way it was labeled.

54.    Continuing forward, what followed was what appears to be a graph with the following elements that read "open," "bid," "ask," "size", "volume", "high", "low", "52 high", "52 low", "quote trend", "last size", "last x", "ask x" and "bid x". From an accessibility standpoint, after each labeled element should be the corresponding value; however, the chart and its elements are not accessible because the element is separated from its value, and the value of an element sits below it, which is a visual demonstration.

55.    As Mr. Hilbert continued to navigate forward, names of securities were on display, such as "SPY SPDR S&P 500 ETF", "AAPL Apple Inc.", "SPX S & P 500 INDEX", "META META PLATFORM INC CAT A", "QQQ INVSC QQQ TRUST SRS 1 ETF", etc.

56.    Swiping backward, Mr. Hilbert double clicked on "META," and the app seemed to have opened a new page. Starting at the top of the page, the first button was labeled as "button" followed by an element that reads "META". The following was another element that read "META PLATFORMS INC A" followed by a button labeled as "delete from wl button".

57.    From an accessibility standpoint, such a button, from the way it was labeled, provides no clarity for someone using a screen reading software and might not be an active trader.

14

58.    What followed were three elements that read "432.62", "431.00" and "431.30". From the way the previous elements were labeled, providing no context auditorily.

59.    When Mr. Hilbert asked a sighted friend, the friend informed him that the first was for the current price, the second was for the bid price, and the third was for the asking price. As mentioned previously, Mr. Hilbert could not independently determine what they were for.

60.    The following were another three confusing elements that read "15695200000", "3" and "2". What followed were three buttons that were labeled as "chart button 1 of 4", "news button 2 of 4", "options button 3 of 4" and "profile button 4 of 4".

61.    Mr. Hilbert selected the first button that read "chart button 1 of 4" and started to navigate forward to explore the chart in display. Beyond the four buttons mentioned earlier were three buttons labeled as "button", "button" and "button".

62.    There was no way for him to identify what they were for due to the way they were labeled. What followed was an element that read "overview" providing no clarity as to its clickability or the information it contained. There were three more elements after that, which read "watchlist," "trade," and "positions." None were clear as to their clickability.

63.    Two more elements in this chart view were labeled as "1" and more. Once more, no clarity as to their clickability.

64.    Frustrated and unable to navigate the chart, Mr. Hilbert decided to navigate backward and selected the button that reads "options button 3 of 4". From that point, Mr. Hilbert started to navigate forward, and the following two elements were completely silent elements, and there was no way for him to determine what they were for.

65.    What followed were two headings; the first read "select up to 4 option legs," and the second read "calls heading". The following were several more headings that read "PUTS heading,"

"bid heading," "ask heading," "last heading," "strike heading," "bid heading," "ask heading," and "last heading." Mr. Hilbert was confused due to the way they were coded, which were headings rather than buttons or checkboxes.

66. As Mr. Hilbert continued to navigate forward, the graph displaying values was completely inaccessible as the elements were completely silent, with no auditory feedback due to the way they were coded. Such an experience puts him at a disadvantage and prevents him from viewing charts and graphs and being an informed investor.

67. Undeterred, Mr. Hilbert decided to try viewing the charts and graphs on the web platform of Charles Schwab, and after having logged in, the website directed him to a page with the heading that reads "heading level 1 account summary".

68. From that point, Mr. Hilbert pressed the F key on his keyboard to navigate by field and was directed to a field that reads "Please enter a symbol." Mr. Hilbert typed in the ticker which was "NVDA" and then started to navigate using the L key on his keyboard to navigate by link, and selected the link that reads "NVDA link".

69. The website seemed to have opened a page with the heading that reads "heading level 2 chart". From that point Mr. Hilbert started to navigate using his right arrow to navigate forward.

70. What followed was a button that reads "chart toggle expanded button" followed by "button group group". The previously mentioned button lacked clarity as to what it was far from the way it was labeled. What followed were nine buttons that read "1 day toggle button", "5 day toggle button", "1 mo toggle button", and "3 mo toggle button". "6 mo toggle button", "ytd toggle button", "1 yr toggle button", "3 yr toggle button" and "5 yr toggle button".

71.    When Mr. Hilbert selected any of the previously mentioned toggle buttons, the cursor of his screen reading software did not appear to skip over to the newly displayed chart. Mr. Hilbert decided to navigate to the displayed chart and the following element reads "+724.7(474.38%)".

72.    The previous element was unclear due to how it was read on the website. The following was simply an image with no image description. Continuing forward, what followed was a display of letters with no way to know what they were for. The letters were "H", "L", "D", "D", "D", "D", "D", "D", "D", "D", "D", "D", "E", "E", "E", "E", "E", "E", "E", "E", "E", "E", "E" and "E".

73.    When Mr. Hilbert clicked on any of the previously mentioned letters, nothing appeared to happen. Mr. Hilbert asked a sighted friend to confirm that nothing happened when clicked and the friend informed him that when Mr. Hilbert clicked on any of the previously mentioned letters the website would display a pop-up menu with the following information "Earnings Announcement", "02/22/2023", "4th Qtr 2023", "GAAP EPS: --", "Consensus Estimate Analysis", "Non-GAAP EPS Estimate: $0.81", "Non-GAAP EPS: $0.88", "EPS -- / --%" and "The next earnings announcement is scheduled for Nov 16, 2022".

74.    There was no way for him to navigate the information that was displayed using his screen reading software.

75.    Continuing to navigate forward, passing by the previously mentioned letters, the following elements were in display "Jul '21", "Oct '21", "Jan '22", "Apr '22", "Jul '22", "Oct '22", "Jan '23", "Apr '23", "Jul '23", "Oct '23", "Jan '24", "Apr '24", "79.55", "159.10", "238.65", "318.20", "397.75", "477.30", "556.85", "636.40", "715.95", "795.50", "875.05", "954.60", "100M" and "200M".

76.   As indicated, the dates appeared to be separate from the corresponding values, preventing Mr. Hilbert from knowing the security price on a particular date using his screen reading software. The chart on the web proved to be as inaccessible as the chart on the Thinkorswim app.

77.   The experience left Mr. Hilbert disappointed and unable to access the goods and services of the Charles Schwab web platform or the Thinkorswim app that they own.

78.   Mr. Hilbert has contacted support and informed them that Mr. Hilbert is a user of a screen reading software, and due to the site and app lack of accessibility, Mr. Hilbert wasn't able to trade due to the accessibility issues of the charts, graphs, as well as how buttons are labeled. The email address Mr. Hilbert used was: "AccessibilityHelp@schwab.com" AccessibilityHelp@Schwab.com.

79.   More recently, on or about June 5, 2025, Mr. Hilbert tried again to access Defendant's Website using an alternative Thinkorswim login page (https://trade.thinkorswim.com). He, once again, faced extensive accessibility issues.

80.   Mr. Hilbert used VoiceOver on his Macbook and utilized standard keyboard navigation commands, including the "B" key to navigate by button and the "H" key to navigate by heading. He encountered unlabeled or poorly labeled elements, such as the "education button," "notification collapsed button," "charts button selected, expanded button," as well as others.

81.   Mr. Hilbert attempted to interact with charts, but they yielded no readable data, just the word "image."

82.   Arrows revealed buttons like "pan left dimmed" and "zoom in," neither of which make any sense through a screen reader nor do they benefit a visually impaired person attempting to use the Website.

83.   These access barriers effectively denied Plaintiff the ability to use and enjoy Defendant's Website the same way sighted individuals do. Mr. Hilbert is unable to manage his portfolio independently and is unable to take advantage of trading opportunities, despite the fact that Charles Schwab is the most appropriate for his needs.

84.   Upon information and belief, Defendant's policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendant's Website.  Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

85.   Due to Defendant's failure and refusal to remove access barriers to its Website, Plaintiff and visually impaired persons have been and are still being denied equal access to Defendant's Website, and the numerous goods, services and benefits offered to the public through its Website.

86.   The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past, and now deter Plaintiff on a regular basis from utilizing the Website, presently and in the future.

87.   Further, when Plaintiff complained of the inaccessibility, he was locked out of his account. Mr. Hilbert attempted to log into the Thinkorswim Website and was unable to login. When he called the number listed, he spoke with an agent named Rob Schmittling, who informed him that Mr. Hilbert's account had been closed "due to an internal request."  To the contrary, he never requested to close his account.

88.    Mr. Schmittling speculated that perhaps the account had been closed due to a lack of funding. However, had that been the case, on information and belief, Mr. Hilbert would have received notice or warning of impending closure.

89.    When Mr. Hilbert sought to reopen his account, he was told that he would have to complete a paper application. He explained that paper applications are not accessible to blind clients, and Mr. Schmittling explained that the only option might be to visit a physical branch location.

90.    If the Website were equally accessible to all, Plaintiff could independently navigate the Website and access and complete the desired business transaction through Defendant's Website as sighted individuals do.  He also would not have to use the services of a sighted person to perform simple transactions and interactions with Defendant's Website.  It is humiliating for a visually impaired person to rely upon the largesse of sighted strangers to navigate through the world.  The internet world is no different.

91.    Through his attempts to use the Website, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.

92.    Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the Website, Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

a.    Constructing and maintaining Website that are inaccessible to visually impaired individuals, including Plaintiff;

b. Failing to construct, update and maintain Website that are sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

c. Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

93. If Defendant's Website was accessible to Mr. Hilbert and other visually impaired individuals, he would return to it as his primary platform for both trading and long-term investment.

94. Defendant therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

95. The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief that Plaintiff seeks in this action. In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities … Where appropriate, injunctive relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

96. Upon information and belief, because Defendant's Website have never been accessible, and Defendant does not have, and never had, an adequate corporate policy that is reasonably calculated to cause its Website to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

a. That Defendant retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultants") who shall assist it in improving the accessibility of its Website so that the goods and services on them may be equally accessed and enjoyed by individuals with vision-related disabilities;

21

b.  That Defendant work with the Mutually Agreed Upon Consultant to ensure that all employees involved in its Website' development and content development be given web accessibility training on a periodic basis at least two (2) times per year, including onsite training to create accessible content at the design and development stages;

c.  That Defendant work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis at least two (2) times per year to evaluate whether its Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

d.  That Defendant work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis at least two (2) times per year with said testing to be performed by individuals with various disabilities to evaluate whether its Website may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendant work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its Website, along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendant and its computer and/or internet experts monitor Defendant's Website for up to two (2) years after the Mutually Agreed Upon Consultant validates that the Website are free of accessibility errors/violations to ensure that it has adopted and implemented adequate accessibility policies.

g.  That Defendant provide Plaintiff's counsel and this Court a report every six (6) months of its efforts to comply and its continued compliance with the ADA, including a representation and warranty that its Website are free of accessibility errors/violations

and to ensure that it has adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

97.    Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible website and/or mobile application will not cause the website and/or mobile applications to remain accessible without a corresponding change in corporate policies related to those web-based technologies.  To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the website and/or mobile applications to remain accessible, Defendant's Website must be reviewed on a periodic basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

98.    Although Defendant may currently have centralized policies regarding maintaining, updating and operating its Website, Defendant lacks a plan and policy reasonably calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

99.    Defendant has, upon information and belief, invested substantial sums in developing and maintaining its Website and has generated significant revenue from its Website and associated transactions at its "brick and mortar" location in Washington, D.C.  These amounts are far greater than the associated cost of making its Website equally accessible to visually impaired customers.

100.    Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the Website, violating their rights.

## FIRST CAUSE OF ACTION
### Violation of the Americans with Disabilities Act
### (42 U.S.C. § 12181 *et seq.*)

101.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges

every allegation of the preceding paragraphs as if fully set forth herein.

102.    Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101, *et seq.*, provides:

> No individual shall be discriminated against on the basis of disability in the
> full and equal enjoyment of the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public accommodation by
> any person who owns, leases (or leases to), or operates a place of public
> accommodation.

42 U.S.C. § 12182(a).

103.    Defendant's Website is a place of public accommodation within the definition of Title III

of the ADA, 42 U.S.C. § 12181(7).  *See Martinez v. Gutsy LLC*, 2022 U.S. Dist. LEXIS

214830, 2022 WL 17303830, at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to dismiss,

holding that plaintiff plausibly stated a claim of discrimination due to allegedly

inaccessible website); *Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, 2017

WL 6547902, at *1 (S.D.N.Y. Dec. 20, 2017) (same); *Romero v. 88 Acres Foods, Inc.*, 580

F.Supp.3d 9, 19 (S.D.N.Y. 2022) (collecting cases); *see also Tavarez v. Moo Organic

Chocolates, LLC*, No. 21-CV-9816 (VEC), 2022 U.S. Dist. LEXIS 154249, at *2 (S.D.N.Y.

Aug. 26, 2022) ("concur[ing] with the vast majority of other judges in this District who

have decided the issue that a 'place of public accommodation' includes public-facing

websites that are not tethered to a physical location" while "not[ing] that at least seven of

its colleagues, one of whom has since ascended to the Second Circuit, have found that Title

III of the ADA applies to websites"); *Wilson v. Fabric Cellar, Inc.*, No. 20-CV-244S, 2021

U.S. Dist. LEXIS 130536 (W.D.N.Y. July 13, 2021) (choosing to "assume without deciding" that the website is a place of public accommodation based on the weight of the case law in the circuit); *Slade v. Life Spectacular, Inc.*, No. 22-CV-0037 (ALC), 2022 U.S. Dist. LEXIS 220079, at *9 (S.D.N.Y. Dec. 5, 2022); *Panarese v. Sell It Soc., LLC*, No. 19-CV-3211 (ARR) (RML), 2020 U.S. Dist. LEXIS 119002, at *2 (E.D.N.Y. July 2, 2020), *adopted by* 2020 U.S. Dist. LEXIS 139893, (Aug. 5, 2020); *Reed v. 1-800-Flowers.com, Inc.*, 327 F. Supp. 3d 539, 550 (E.D.N.Y. 2018); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y. 2017).

104.   The Website is a service offered to the general public and, as such, must be equally accessible to all potential consumers.

105.   Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

106.   Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

107.   Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure

to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

108.    The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

109.    Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

110.    Furthermore, Plaintiff has been denied full and equal access to the Website offered by Defendant, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons.  Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct.  These violations are ongoing.

111.    If Defendant's Website were accessible to him and other visually impaired individuals, Plaintiff would return to it as his primary platform for both trading and long-term investment. As the Website currently stands, he is unable to access the benefits of Charles Schwab's product due to their refusal to conform to accessibility standards.

112.    Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION
## <u>Violation of the D.C. Human Rights Act</u>
### (D.C. Code § 2-1401, *et seq.*)

113.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

114.    The DCHRA makes it "… an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived: … disability… of any individual: (1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations." D.C. Code § 1-1402.31(a)(1). Defendant is systematically violating the DCHRA.

115.    In addition, "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 1-1402.68.

116.    Defendant is a "place of public accommodation" within the meaning of the DCHRA because it is a "… person or place that provides, to a person in the District, access to an accommodation, service, or good, whether or not that person or place maintains a physical location in the District or charges for those goods or services, such as inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest," which includes its physical facility and its goods and services offered to consumers in the District of Columbia through its investment services.

117.    Plaintiff has a physical disability as a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.

118.    Defendant's Website is a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who is visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the DCHRA by denying visually impaired customers the services and products provided by its Website.  These violations are ongoing.

119.    Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the DCHRA because Defendant constructed and/or maintains its Website, which are inaccessible to Plaintiff, knowingly maintains its Website in their inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

120.    Defendant is also violating the DCHRA because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* The U.S. District Court for the Southern District of New York has held that a claim for disability discrimination under the NYSHRL is governed by the same legal standards as the ADA. *Range v. 535 Broadway Grp. LLC*, 2019 U.S. Dist. LEXIS 149905 at *16 (S.D.N.Y. 2019) (*citing Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) (citation omitted)); *see also Sullivan v. Study.com LLC*, 2019 U.S. Dist. LEXIS 47073 at *16 (S.D.N.Y. 2019) ("It is true that the NYSHRL … [is] governed by the same legal standards that courts apply to ADA disability discrimination claims.").

121.    Defendant's actions were and are in violation of the ADA and DCHRA and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination. D.C. Code § 2-1403.07.

122.  Plaintiff and those similarly situated are also entitled to a preliminary and permanent injunction enjoining Defendant from violating the DCHRA and requiring Defendant to take the steps necessary to make its Website readily accessible to and usable by visually impaired individuals. D.C. Code § 2-1403.07.

123.  Defendant's denial of accessible Website and its discrimination against Plaintiff and those similarly situated renders it liable for each and every offense for compensatory damages in an amount to be determined by a jury and civil penalties that may be determined by the Court.  D.C. Code § 2-1403.16(a).

### THIRD CAUSE OF ACTION
### Declaratory Relief

124.  Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

125.  An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendant denies that its Website contain access barriers denying blind and/or visually impaired customers the full and equal access to the products, services and facilities contained in its Website, which Defendant owns, operates and controls, fails to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act and the DCHRA, prohibiting discrimination against the blind and visually impaired.

126.  A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.     For a judgment that Defendant violated Plaintiff's rights under the ADA and the DCHRA;

B.     A preliminary and permanent injunction prohibiting Defendant from violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.* and the DCHRA;

C.     A preliminary and permanent injunction requiring Defendant to take all steps necessary to make its Website fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Website are regularly accessible to and usable by blind and visually impaired individuals;

D.     A declaration that Defendant owns, maintains, and/or operates its Website in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA and the DCHRA;

E.     Economic, compensatory and/or punitive damages under the DCHRA, as applicable, in an amount to be determined at trial;

F.     Pre- and post-judgment interest;

G.     An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.     Such other and further relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: June 13, 2024          Respectfully submitted,

**ERIC SIEGEL LAW, PLLC**

By   /s/ Eric L. Siegel_____
Eric L. Siegel (Bar No. 427350)
esiegel@ericsiegellaw.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(771) 220-6116 (Office)
Ble (202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*

## VERIFICATION

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendant's Website and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on June 13, 2025.

DocuSigned by:

*Laurel Hilbert*

DC1A383A843446B...

_____

Laurel Hilbert, Plaintiff